UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>RYAN CARROLL, *et al.*,<br><br>    Defendants.<br>_____/ | No. CR-13-0566 EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CARROLL'S MOTION TO SUPPRESS STATEMENTS**<br><br>**(Docket No. 58)** |

## I. BACKGROUND

On October16, 2008, at roughly nine o'clock in the morning, Ryan Carroll was awakened by Shayla Gearin. Gearin was Carroll's girlfriend at the time, and Carroll was living with her in her parents house in Lynnwood, Washington. Gearin awoke Carroll at the behest of Detectives Cheryl Franco and Wayne Hanson of the Humboldt County Police Department – who had awoken Gearin by knocking on the door to her house. Franco and Hanson asked Gearin and Carroll if they "would be willing" to join them at the Lynnwood police department for a brief conversation. Gearin told the officers she would not speak with them without her attorney present. The detectives respected Gearin's insistence on having counsel, and provided her with a phone with which to call her attorney. Gearin's attorney asked to speak with Franco, and told Franco he would bring Gearin to the department within an hour. After deliberating with Gearin about whether he should go down to the department without her, Carroll decided it would be "cool." Carroll did not have an attorney and did not insist on having one present. Franco explained to Carroll that things would go "quicker and smoother" if they could talk with him while waiting for Gearin. "[T]hat way when [Gearin] gets [to

1 the department] you'll be done probably." Carroll accepted Franco and Hanson's invitation, and
2 their offer to give him a ride to the department.

3 Carroll arrived at the department around 9:30 am. There a plain-clothed Lynnwood police
4 officer – Jeff Mason – joined with Franco and Hanson to escort Carroll to a room where the
5 conversation could commence[1]. The room was located on the second floor of the department, in a
6 secured area where unauthorized personnel were not permitted to roam unescorted. Once they
7 arrived, Franco, Hanson, and Carroll crowded themselves into the seven-foot by seven-and-a-half-
8 foot room. Mason stationed himself outside the door to guard against any unauthorized
9 "wandering."

10 Carroll answered Hanson and Franco's questions inside the interrogation room for the next
11 three hours. At that point Hanson said he would "give" Carroll a "break" while they spoke with
12 Gearin. Hanson specified that Carroll could take that break in the lobby, or potentially smoke a
13 cigarette outside, but made it clear that Carroll was needed for further questioning. After about
14 eighty minutes, Carroll was brought back to the interrogation room for questioning. The
15 interrogation turned accusatory quickly; within ten minutes the officers confronted Carroll with
16 evidence that implicated his involvement in the killing of Rana. From there, Franco repeatedly
17 accused Carroll of being at the scene of the crime, stealing Rana's belongings, and destroying
18 evidence of the murder. When Carroll denied it, Franco told him to stop lying. The accusations and
19 questioning continued for the next hour and a half, at which point the officers agreed to feed Carroll
20 his first meal of the day. Carroll asked to have lunch with his girlfriend multiple times. The officers
21 did not heed his requests. Instead, they took him to a local Jack-In-The-Box for forty minutes, then
22 returned him to the interrogation room for further questioning. All told, Carroll's second
23 interrogation of the day lasted four hours, during which Carroll made numerous incriminating
24 statements.

---

[1] At the evidentiary hearing, Jeff Mason testified to the location of the room, the security protocol of the Lynnwood police department, and his role in the interrogation.

2

Carroll now moves to suppress those statements because (1) the officers failed to inform him of his Fifth Amendment rights prior to his custodial interrogation; and (2) his statements were involuntary.

## II. DISCUSSION

### A. Miranda Violation

The Constitution requires that a person be advised of certain rights if they are "in custody" and "subjected to interrogation." *Miranda v. Arizona*, 384 U.S. 436, 467-468. The government's failure to provide such advisements renders statements made by a person during a custodial interrogation inadmissible. *See id*.

Here, the parties do not dispute that the detectives (1) failed to provide Carroll with a *Miranda* warning; and (2) interrogated Carroll within the meaning of *Miranda.* Thus, the question of whether Carroll's statements must be suppressed turns on whether Carroll was in "custody" at the time he made them.

In determining whether an individual was in custody, a court must inquire as to whether "a reasonable person would have felt that he or she was at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). If, considering the totality of the circumstances, a reasonable person would not feel free to leave the interrogation, then the interrogation was custodial. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). Generally, a reasonable person would not feel free to leave if "something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969); *see also Dyer v. Hornbeck*, 706 F.3d 1134, 1143 (9th Cir.2013) (M. Smith, J., concurring) (explaining that circumstances and authorities' psychological pressure created custody, despite the fact that detainee was aware of her physical ability to leave during an unescorted bathroom break or out of an unlocked door of the interrogation room).

The Ninth Circuit has set forth the following non-exhaustive list of factors that are particularly relevant to the custody inquiry: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of

1  the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain
2  the individual." *Kim*, 292 F.3d at 973 (quoting *United States v. Hayden*, 260 F.3d 1062, 1066 (9th
3  Cir. 2001)) (internal quotations omitted).  Other factors may also be "pertinent to, and even
4  dispositive of, the ultimate determination whether a reasonable person would have believed he could
5  freely walk away from the interrogators." *Id.* at 974.

6      Here, Carroll was subjected to interrogation for two discrete periods of time.  First, he was
7  interrogated from approximately 9:30 am to 12:11pm.  After a break lasting nearly eighty minutes,
8  the detectives resumed their interrogation of Carroll from about 1:30pm to 5:30pm.  In determining
9  whether Carroll was in custody during either interrogation, the Court looks to the circumstances
10 attendant to each.

11     1.    Morning Interrogation

12     The first *Kim* factor – the language used to summon the defendant – weighs in favor of the
13 government.  Detectives Hanson and Franco's initial statement to Carroll was:

> [W]e want to talk with you.  We'd like to talk with you down a the Lynnwood Police Department, just its nicer there.  Would you be willing to come down there with us?

16 *Id*. at 9:5-6.  Use of the words "would you be willing" directly implies that Carroll had the ability to
17 decline their invitation.  Further, the detectives acceded to Carroll's responsive request that he would
18 like to "talk to [his] girlfriend about it first" because he is "kind of dumb." *Id.* at 9:8.  The detectives
19 offered to give Carroll a ride to the department "unless [he had] a car." *Id*. at 9:19-21.  When
20 discussing the logistics of Carroll's transport to the department, Detective Franco clearly indicated
21 that her suggestions were merely "[f]ood for thought." *Id*. at 11:2-4.  When the logistics seemed
22 settled Franco asked for Carroll's final approval. *See Id*. at 17 ("Does that work for ya?").  When
23 Carroll asked if he could "grab a pack of smokes" before joining the detectives, Franco responded
24 "absolutely." *Id*. at 19:8-10.  While the discussion lasted almost fifteen minutes, the officers'
25 language was not coercive, and reflected deference to Carroll's preference.  Carroll's acceptance of
26 the officer's invitation was voluntary. *See United States v. Bassignani*, 575 F.3d 879 (9th Cir. 2009)
27 (finding that voluntary interaction with law enforcement weighed in favor of non-custody.)

28     Once at the police department, Franco told Carroll:

> 1  I appreciate you coming down here and talking to us, and [] if you
> 2  want to leave just let me know, we don't know this building but we will get ya out. Alright, it not a problem just let me know . . .

Ex. B at 36:14-16. This explicit instruction to Carroll, that he was free to leave, also weighs in favor of a determination that the interrogation was non-custodial. *United States v. Crawford*, 372 F.3d 1048, 1051 (9th Cir. 2004) (explaining that an advisement to the suspect that "he could leave any time" strongly indicated a non-custodial interrogation). Accordingly, the first *Kim* factor weighs decidedly in favor of the government.

The second factor – the extent to which the defendant is confronted with evidence of guilt – weighs in favor of the government as well. While interrogating Carroll, the officers did not present any evidence suggesting Carroll's guilt. *United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005) (explaining that "merely asking" about allegations without a presentation of evidence suggesting guilt supports a non-custodial finding). Further, for the first two hours of the interrogation, the conversation was largely driven by Carroll, who presented a story of being ripped-off in an attempt to purchase a large amount of marijuana. Through out the entire interrogation, the detectives asked follow up questions regarding the details of Carroll's story, but they did not contradict him with evidence or challenge his account of events. *Cf. United States v. Lee*, 699 F.2d 466, 467 (9th Cir. 1982) (finding custody where, among other things, law enforcement "confronted [a suspect] with evidence of his guilt, and told him it was time to tell the truth"). Thus, the second *Kim* factor weighs against custody as well.

The third factor – the physical surroundings of the interrogation – weighs heavily toward a finding of custody. Carroll was interrogated in a windowless, seven-foot by seven and a half-foot room in the Lynnwood police department. *See* Docket No. 139; *see also* HEARING; *Crawford*, 372 F.3d at 1059 (recognizing that interrogations in a police station generally weighs toward custody); *Kim*, 292 F.3d at 972 (finding that small windowless rooms that isolate or restrict a defendant can create a "police dominated" environment and indicate custody). Furthermore, the interrogation room was located in a secure-access area, in which any unescorted movement of unauthorized personnel and the public is prohibited. Thus, Carroll was dependent upon the officers to escort him out of the room, and out of the secure area. *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir.

1985) (a suspect's dependence on the authorities for the ability to leave weighs toward custody). This security protocol was adhered to, and a Lynnwood police officer – Jeff Mason – sat by the door of the interrogation room to make sure Carroll did not try to "wander around" while Detectives Hanson and Franco stepped out.   In short, Carroll was interrogated in a small room, isolated within a secured floor of a police department, under constant supervision by three visibly armed police officers.

The fourth factor – duration of interrogation – also weighs in favor of a finding of custody. Carroll's morning interrogation lasted nearly three hours. This duration has been held to tip this factor toward a finding of custody. *See United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (finding that an interrogation lasting roughly two hours is indicative of custody); *see also Bassignani*, 575 F.3d at 887 (noting that an interview lasting slightly more than two hours was "lengthy" and weighed toward custody).

The final factor – the degree of pressure applied to detain the defendant – weighs against non-custody. The detectives did not physically restrain, threaten or accuse Carroll in a manner that would substantially undermine Franco's statement to Carroll that he could leave when he wanted. While the impact of Franco's statement that Carroll was free to leave had likely dissipated after three hours of questioning in a small room since that statement was not repeated, the detectives did not pressure, cajole, or confront Carroll during the morning interrogation. Thus, the final factor weighs in favor of a finding of non-custody.

Taken as a whole, the *Kim* factors favor a determination that a reasonable person in Carroll's circumstances would have felt free to leave the interrogation. Thus, Carroll was not in custody during the first interrogation, and the motion to suppress is **DENIED** as to the statements made during it.

2. Afternoon Interrogation

The environment of the afternoon interrogation was different; nearly all the *Kim* factors point to custody. The first *Kim* factor – the language used to summon the defendant – is neutral. On the one hand, Carroll agreed to wait in the lobby (or on the outside benches) while the detectives spoke with Gearin prior to the afternoon interrogation. While Carroll was free physically to leave as he

was left unescorted for about an hour, that fact is not dispositve. *See Dyer v. Hornbeck*, *supra*. Notably, although Carroll agreed to wait and return for further questioning, he may have felt under some pressure not to leave without submitting to further questioning. At the end of the first three hours of interrogation in the morning, Detective Hanson said to Carroll:

> . . . *We'll give* you a little break, ya know you can hang outside in the lobby or bum a smoke off somebody while we talk to your girlfriend **but** I have a couple more quick questions for ya, to rap it up today. If that's okay with you?

Exhibit C at 142:1-3 (emphasis added). The detectives did not plainly inform Carroll he was free to leave. They characterized this period of time as a "break." Then, during the next four hours of interrogation, they did not tell him he was free to leave. In fact, as discussed below, they refused to heed his request to leave and have lunch with his girlfriend.

The second factor – the extent to which the defendant is confronted with evidence of guilt – weighs strongly in favor of Carroll. The nature of the interrogation took a distinct turn when it resumed after the break. A few minutes into the afternoon interrogation, Franco confronted Carroll with the story – credited to Gearin – that Carroll had started crying and run away upon hearing that Humboldt County detectives were contacting the Gearins about a homicide. Franco then tells Carroll that she interprets the story to mean "that [Carroll is] keeping something from [her] and [she has] a feeling that it is something very important and [she'd] like to know what that is." Ex. D at 4:11-17. This testimonial evidence both contradicted Carroll's prior statements and broadly implicated his involvement in a serious crime. *See United States v. Toliver*, 480 F. Supp. 2d 1216, 1219 (D. Nev. 2007) (finding that an officer's use of witness statements to contradict a defendant indicated custody). Franco also accused Carroll of being at the scene of Rana's murder multiple times. *See Id*. at 5-6. Franco accused Carroll of taking Rana's car (*Id*. at 9:17-24) and then of burning Rana's car (*Id*. at 10). When Carroll denied each of these accusations, Franco told him "we need one hundred percent honesty." Such repeated suggestions of involvement in a serious crime weighs in favor of finding custody. *See Wauneka*, 770 F.2d at 1438-39 (finding that accusatory questions indicated custody); *Lee*, 699 F.2d 466, 467 (9th Cir. 1982) (finding custody where, among other things, law enforcement "confronted [a suspect] with evidence of his guilt, and told him it was

time to tell the truth"). Moreover, through out the interrogation the detectives raised their voices and repeatedly accused Carroll of lying. *Id.* at 10:7-12; *Bassignani*, 575 F.3d at 884 ("We have found a defendant in custody when the interrogator adopts an aggressive, coercive, or deceptive tone."). The accusatory nature and tone of the afternoon interrogation is distinctly different from the course and tone of the morning interrogation.

The third factor – the physical surroundings of the interrogation – continued to weigh toward a finding of custody. As discussed above, Carroll was interrogated in a small room, isolated within a secured floor of a police department, under constant supervision by three visibly armed police officers.

The fourth factor – duration of interrogation – also weighs even more strongly in favor of a finding of custody than the morning session because Carroll's second interrogation was four hours long, and came on the heels of a three hour interrogation. *See Barnes*, 713 F.3d at 1204. Furthermore, Carroll was deprived of food from his waking hour of nine o'clock in the morning to three o'clock in the afternoon when he was finally taken to a fast food lunch.

The final factor – the degree of pressure applied to detain the defendant – also favors custody. Carroll was visibly and professedly fatigued by the beginning of the second interrogation as the questioning turned accusatory. Carroll's fatigue and unease was further underscored by his intermittent crying, shaking, and physical manifestations of distress visible from the video. *See* Docket No. 78, Exhibit 2, *Video* at 14:53 - 15:08. Moreover, Carroll repeatedly told the officers that he "just want[ed] to hang out with [his] girlfriend" (Ex. D at 73:11) and requested that he be allowed to have lunch with her (*Id.* at 73-75). The officers did not heed his requests. Such a failure is highly indicative of custody. *Hall*, 421 F.2d 545 ("something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which ***indicates that they would not have heeded a request to depart*** or to allow the suspect to do so.").

Taken as a whole, the *Kim* factors favor a determination that a reasonable person in Carroll's circumstances would not have felt free to leave the afternoon interrogation. Thus, Carroll was in custody within the meaning of *Miranda*. Because Detectives Hanson and Franco failed to give him a *Miranda* warning, Carroll's statements during the afternoon interrogation must be suppressed.

B. <u>Voluntariness</u>

Carroll further contends that his statements should be suppressed because they were made involuntarily. The Court disagrees.

A confession is voluntary "when it is the product of a rational intellect and a free will." *United States v. Leon Guerrero,* 847 F.2d 1363, 1365-66 (9th Cir. 1988) (internal citations omitted). In deciding whether a defendant's confession was voluntary, a court must consider "whether [the] defendant's will was overborne by the circumstances surrounding [the] giving of the confession," an inquiry that "takes into consideration the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal quotations omitted). In "company with all of the surrounding circumstances," the Supreme Court has recognized the following relevant factors: "the duration and conditions of detention, the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which or sustain his powers of resistance and self-control." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

"The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Leon Guerrero*, 847 F.2d at 1366 (internal citations omitted).

Here, considering the totality of the circumstances, the Court finds that although the *Kim* factors establish custody during the afternoon interrogation, Carroll's will was not overborne through physical or psychological coercion, or by improper inducement. First, Franco and Hanson did not offer Carroll any inducements. While Hanson told Carroll that George W. Bush was giving Carroll "amnesty" for his marijuana related offenses, that statement was laughed at by both Carroll and Hanson. Ex. C at 102:2-103:5. Viewed in context, it is clear that this statement was a joke, and did not have the effect of inducing Carroll's statements. *See id.* at 103:5 ("Carroll: "I'm psyched, George W. Bush is giving me amnesty (*laughing*)"). Moreover, there was no promise of amnesty from the murder charge in exchange for an admission.

Second, while Carroll's interrogation was undoubtedly physically and psychologically taxing for the reasons discussed above, it was not sufficiently so to meet the involuntary standard. *Cf. United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000) (finding statements voluntary where suspect was suffering from heroin withdrawal during interrogation and the questioning agents had promised him leniency in return for his cooperation); *cf United States v. Preston*, 751 F.3d 1008, 1014 (9th Cir. 2014) (finding statements involuntary where suspect was mentally disabled and officers misled and deceived the defendant during questioning). Accordingly, the Court rejects Carroll's request to suppress his statements as involuntary.

IT IS SO ORDERED.

Dated: May 1, 2015

_____
EDWARD M. CHEN
United States District Judge